No. 1-02-1967, In re April C., Amy C., and Anna C.

FIRST DIVISION

January 20, 2004

No. 1-02-1967

In re APRIL C., AMY C., AND ANNA C., Minors

(The People of the State of Illinois

Petitioner-Appellee,

v. 

Kathleen C.,

Respondent-Appellant).

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the Circuit Court of Cook County

97 JA 2301

97 JA 2302

97 JA 2303

Honorable 

Stephen Y. Brodhay,

Judge Presiding

JUSTICE McBRIDE delivered the opinion of the court:

On October 1, 1997, the juvenile court found that April C., Amy C., and Anna C. (collectively, the minors or the children) were physically abused, subjected to excessive corporal punishment, and at a substantial risk of physical injury while in the care of respondent, their natural mother, and Ernie C., their natural father.  They were adjudged wards of the court on June 24, 1999.  Respondent and Ernie C. separately appealed those findings.  In 
In re April C.
, 326 Ill. App. 3d 225 (2001), we affirmed the juvenile court's findings with regard to respondent.  We similarly affirmed the findings against Ernie C. in 
In re April C.
, 326 Ill. App. 3d 245 (2001).  The State subsequently petitioned for termination of parental rights and authority to consent to adoption of the minors.  

On June 11, 2002, the juvenile court found that respondent was unfit to be the children's parent because "she failed to make reasonable progress toward return home within 9 months after adjudication," and "[s]he failed to maintain a reasonable degree of concern or responsibility as to the child[ren]'s 
welfare."  See 750 ILCS 50/1(D)(b), (m)(ii)(West 2000).  The court subsequently determined that it was in the children's best interests to terminate respondent's parental rights.  In simultaneous rulings, the court found that Ernie C. was unfit and terminated his parental rights.  Respondent appeals claiming that the court erred in finding her unfit and in terminating her parental rights.  Ernie C. has not appealed the findings against him.  

Before considering the merits of respondent's claims on appeal, we address respondent's motion to strike portions of the State's brief.  Without citing any authority in her motion, respondent urges us to strike those portions of the State's brief that refer to our opinion affirming the determinations of abuse and wardship in this case.  Respondent claims that "there is no indication that the trial court based its decision in this termination case on anything contained in this Court's prior opinion."  Respondent argues that it is prejudicial to allow the State to cite to our prior opinion and that the prior opinion is not relevant to the instant proceeding.  She further contends that the records from the abuse and wardship proceedings were not part of the record on appeal and that if the State wanted us to consider the records from those proceedings, it should have filed a supplemental record.  

The State urges us to deny respondent's motion because the motion lacks authority for the requested relief.  Additionally, the State asserts that, contrary to respondent's argument, the juvenile court based its finding of unfitness, in part, on the prior determinations of abuse and wardship.  The State maintains that the facts it cites from the opinion are relevant because they establish that the minors suffered abuse while in the care of respondent and because they provide information regarding the conditions from which respondent needed to make progress in order to regain custody of the children.  The State also asserts that the opinion is a public record and establishes the law of this case.

The particular facts to which the State cites and respondent objects are a series of stipulations that were entered and agreed to by the parties at the adjudication hearing.  The stipulations can be found in our previous opinion.  
In re April C.
, 326 Ill. App. 3d at 227-29.  The majority of the stipulations dealt with Ernie C.'s abusive conduct.  Significantly, the parties stipulated "to a finding that April, Amy, and Anna had been physically abused by Ernie C., had been subjected to excessive corporal punishment and were at a substantial risk of injury."  
In re April C.
, 326 Ill. App. 3d at 228.  

In determining whether to grant respondent's motion, we initially note that our prior opinions in this case are part of the record on appeal and the juvenile court commented on the abuse finding several times during the proceedings at issue in this appeal.  In one instance, it referred to the prior findings when it overruled an objection that evidence of physical abuse "assume[d] facts not in evidence."  Thus, it appears that the juvenile court was aware of the findings and considered them in its decisions regarding parental fitness and the children's best interests.  No party to this appeal claims that the juvenile court's consideration of the prior findings was error.  Accordingly, we will not consider that issue.  See
 
188 Ill 2d. R. 341(e)(7)("Points not argued are waived ***").  In any event, respondent offers no authority to support her motion and does not explain how our consideration of evidence to which she previously stipulated prejudices her.  See
 People v. Gibson
, 287 Ill. App. 3d 878, 880 (1997)(As a general rule, "a defendant is precluded from attacking or otherwise contradicting any facts to which he has previously stipulated").
  Thus, respondent's motion is denied.          

Having resolved that issue, we turn to the merits of respondent's appeal.  First, we recognize that under the Juvenile Court Act o 1987 (705 ILCS 405/1-1 
et seq.
 (West 2000)), two steps must be followed in the involuntary termination of parental rights.  
In re Jeffrey S.
, 329 Ill. App. 3d 1096, 1101 (2002).  The first step entails a finding based upon clear and convincing evidence that the parent is unfit as defined in the Adoption Act (750 ILCS 50/1(D)(West 2000)).  
In re Jeffrey S.
, 329 Ill. App. 3d at 1101.  The second step requires the court to consider whether it is in the child's best interest to terminate parental rights (705 ILCS 405/2-29 (West 2000)).  
In re Jeffrey S.
, 329 Ill. App. 3d at 1101.  We consider each step separately.  We note, however, that in summarizing the evidence with regard to each step, we discuss the evidence regarding Ernie C. only to the extent that it is necessary to fully evaluate respondent's claims on appeal.

At the fitness hearing, Julie Dvorsky, a supervisor at Hephzibah Children's Association (Hephzibah), testified that Lisa McDonald Seghetti of the Department of Children and Family Services (DCFS) referred this case to her for the purpose of providing "an assessment for DCFS regarding the parental capacity of [respondent] and [Ernie C.] to parent to the children Amy, April and Anna."  Dvorsky explained that the case came to her as a consequence of "risk to Amy, April and Anna," specifically, excessive corporal punishment.  She explained that she and another Hephzibah worker met with the parents, observed parent/child visits each week, consulted with other service providers, and reviewed all documentation submitted in relation to the family.  Upon making her initial assessment, Dvorsky consulted with Seghetti and recommended that each member of the family receive a psychological evaluation; the evaluations were conducted in September 1997.  Respondent's evaluation recommended that she receive individual psychotherapy.  She was referred to Mary and Tom Leo and Associates for individual counseling.    

During the nine months following the determination of abuse, Dvorsky supervised weekly visits between the parents and the children "to observe the interactions between the parents and the children, document those interactions, [and] see how the communication was between the parents and the children."   Following the court hearing at which the determination of abuse was made, Dvorsky supervised a visit between the parents and the children at Hephzibah in Oak Park.  She explained that when the parents arrived, "they were very upset and angry about the court date that had happened earlier that morning."  Respondent was very angry and "had to be directed not to talk about the court date that happened that morning."

During the nine months following that visit, Dvorsky was present for nearly 90% of the visits between the parents and children.  She described respondent's behavior during the visits:

"She would *** come into the visits angry.  She would be sarcastic with the children about what they were wearing, about what was going on in the foster home.

She would also interrogate the children about the foster home and try to find out if there was any abuse going on in that home."

Dvorsky admitted that it was not unusual for a parent to express concern about how her children were being treated in foster care, but that respondent spoke in a harsh way that caused the children to "shut down and not respond."  Dvorsky further explained:

"[Respondent] often showed very little emotion during the visits.  Her affect was often flat.  And the way she interacted with the children was -- it seemed very forced and mechanical.  And when she was relating things to the children, it seemed *** it wasn't coming naturally."

In November 1997, visitation was suspended after the police were called because of Ernie C.'s behavior during one of the visits.  The purpose of suspending the visits was to allow the parents to undergo individual psychotherapy.  The visits were reinstated after approximately one month.  The December 22, 1997, visit, which was the first visit after reinstatement, "generally went okay."  At the January 8, 1998, visit, however, Ernie C. took the children's school identification cards.  Dvorsky had to meet the parents at a restaurant to retrieve the cards because the parents did not want her to come to the home where they lived together.  The parents apologized for taking the cards.

On February 28, 1998, Dvorksy supervised a visit with the family.  She had been encouraging the children to express themselves during the visits, 
i.e.
, to talk about school and their activities.  But the parents "did not acknowledge what the kids were trying to tell them.  They were focused on things that were happening in the case."  Dvorsky admitted that it was not unusual for the parents to be concerned about the case, but she had talked with respondent and Ernie C. about the need to address those issues outside the family visits.  Her instruction was generally disregarded.  

During an April 9, 1998, visit, which Dvorsky supervised, April expressed to her parents that she wanted to attend an "away" track meet that was scheduled on one of their visitation days.  "[T]he parents got immediately upset with April and told her that she was choosing the track meet over her family."  Dvorsky offered to have visitation on a different day, but the parents "said they could not visit any other day and they blamed [April] for not wanting to be a part of the family."  April shut down after the comments, tears were in her eyes, and she was visibly upset.

On July 9, 1998, a visit was scheduled to celebrate Amy's birthday.  The parents wanted to take a walk before celebrating the birthday.  The walk concerned Dvorsky because "the father walked very fast ahead of [her] and the mom kind of stayed back."  Most of that visit was spent outside and was not focused on Amy's birthday.  When the family returned to the office, they had only about 15 minutes to celebrate Amy's birthday.  

Anna's birthday celebration was held the same month, but at her party, respondent brought cake and sang "Happy Birthday."  Dvorsky noticed that Amy was often neglected during the visits, with Ernie C. devoting most of his attention to April and respondent devoting her attention to Anna.  Dvorsky encouraged the parents to give more attention to Amy, but she did "[n]ot necessarily" notice any change or improvement in their interactions with Amy after her discussion with them.  Also in July 1998, Dvorsky suspended weekly phone calls between the parents and children because the children's therapist reported that the calls were disruptive for them, that negative behavior often occurred around the phone calls, and that the parents were encouraging the children to call 911 and claim that they were being abused in the foster home.

Dvorsky admitted that respondent completed the recommended psychological examination, finished two recommended parenting classes, appeared at scheduled family therapy sessions, participated in individual psychotherapy and marriage counseling, and attended scheduled visits with her children.  She conceded that when visits occurred without Ernie C., they generally went better than they did when he was present because, at times, Dvorsky was better able to direct respondent when Ernie C. was not present.

Dvorsky recommended the second parenting class because she had not seen any "improvements in [the parents'] visitation with the children" after the first class.  After the parents completed the second class, she still did not notice any improvement in their behaviors.  She opined that although respondent participated in all the recommended services, her relationship with the children did not improve during the visits.  Dvorksy admitted that "approximately a month or so into *** services with the family" she had reported that " '[f]or the most part the visits go well, but often the parents need to be directed in the context of what they are saying to the children or they often try to tell the children things without the worker hearing.' "  In January 1999, "the parents' behavior was very difficult to redirect and manage," and it was necessary to have three workers present at each visit.

In October 1997, Dvorsky referred the family to family counseling with Joe Kurtasi at the Center for Contextual Change.  However, the counseling was terminated after only four sessions because "the family was not ready for family therapy" and the parents needed to "focus on individual therapy."  In June 1998, Dvorsky made a second referral for family counseling.  This time the counseling was provided by the children's therapist, Annette Jordan.  During June 1998, Dvorsky was called into a session at which the children and respondent were present.  There had been some sort of disruption.  Dvorsky and Jordan sat with respondent to "try to de-escalate her anger and anxiety" about what had happened inside the meeting.  After the occurrence, the family sessions were terminated.

Dvorsky described that between October 1, 1997, and July 1998, she saw only very minimal progress in how the parents interacted with the children during visitation.  She described that the minimal progress was that at some visits the parents were not angry when they came in and they tried to engage the children.  Still, Dvorsky would not have granted the parents unsupervised visits in July 1998 because she was concerned about what she had observed during visitation.

"[Ernie C. and respondent] many times attempted to whisper things to the children which later *** [the children] would become upset about. 

The parents' interactions with the children were often very concerning as far as how they didn't respond to them ***."

Dvorsky also stated that she would not recommend in July 1998 that the children be returned to their parents' care because

"[t]he parents had not made substantial or significant progress in their services or during their visitation with the children. *** Hephzibah workers *** still had to intervene during the visits and redirect the parents' behaviors because they were saying inappropriate things to the children."

The case was transferred back to DCFS in March 1999 because Dvorsky did not feel that "the parents had the capacity to parent [the] children."  Dvorsky explained that she often referred to "the parents" rather than either parent individually because during the time that she was involved with the case "[Ernie C. and respondent] insisted on working together as a couple to regain custody of their children."  Accordingly, she never addressed whether one parent would alone be capable of caring for the children.   

Trayci Handelman was employed by DCFS as a followup placement worker from August 1993 until shortly before the hearing.  She began working on this case in February 1999, when she received it from Lisa McDonald Seghetti.  She reviewed the case file and discovered that at the time the case was assigned to her, the parents had not complied with all the services that had been requested. 

On cross-examination, Handelman explained that she had offered respondent additional marriage counseling, but she could not recall when she made the referral or to what provider it was made.  She testified similarly with regard to a referral for individual counseling for respondent in 1999.  Handelman believed that respondent had failed to comply with services that were recommended from her psychological evaluation and with joint counseling with her husband.  Handelman could not specifically identify the alleged deficiencies.

Handelman observed two or three visits between the parents and children.  The visits were "very stressful for the children" at times.  She explained:

"The children before the visits, during and after, were extremely stressed out about having to spend time with their parents.  They were worried.  They were anxious and they were fearful of going to these visits."

During the time she was assigned to the case, Handelman would not have recommended that the parents have unsupervised visits with their children or that the children be returned to their parents' care "[b]ecause [the parents] had failed to comply with the recommendations [and] with the evaluations.  They had failed to complete services, and there was no progress towards reunification ***."

Thomas Leo, a co-director at Mary and Tom Leo and Associates where the parents received some counseling services, testified as an expert in the area of family counseling and family assessments.  The case was referred to him by DCFS.  Counseling began in November 1997.  Leo and Linda Burke provided joint counseling to the parents.  The counselors developed goals for the couple to address together because the parents were "looking to obtain custody of their children together."  Some of the goals included ascertaining the parents' ability to provide a safe and secure environment for their children, addressing the issues that brought the case to DCFS, getting supervised visitation reinstated, and improving relations with the children while the children were in foster care.

Through June or July 1998, the couple was regularly in attendance at the sessions.  The couple was successful in having supervised visitation reinstated within a month or two of starting counseling.  Leo explained, however, that there were some difficulties with the therapy:

"[O]ne of the difficulties was their approach to the whole system or the whole events of what had happened.  They conditionally felt that they were being punished, singled out unjustly in being punished or persecuted.  And one of the things that they would say is well there is [
sic
] other people that are drug abusers worse than us.  They got [
sic
] their kids. ***

It did not seem *** that they were able to carry out some good judgment in relationship [sic] to their daughter[s].  For example[,] the visits were reinstated, but there were different reports all the time of them saying things to the girls that were disruptive to them[,] that were bothersome to them.  They would also project the problems onto *** either [the] foster parent or more frequently the Hephzibah agency and even though we tried to explain to them that the foster parent *** didn't come and take their kids.  This lady is just doing the job that she has been assigned to do.

Another difficulty we did eventually have a joint meeting with them and the foster parents that seemed to go fairly well at Hephzibah.  But [in] a week or so they were making complaints again about small things regarding stuff in the foster home that really didn't have to do with them relating to their children."

Additionally, respondent failed to take any responsibility for the children being in foster care:

"Respondent did not seem to be able to get into that at all ***. [S]he never seemed to be able to see that she had to do something more than say, hey, I didn't do anything wrong."

Leo consulted with others working on the case, and together they hoped that respondent would be the "less threatening parent" and could be successfully involved in family therapy with the children.  However, between October 1997 and July 1998, the respondent showed only minimal progress in her ability to provide a safe and stable environment for the children.  The parents seemed to make no progress in using "good judgment" with regard to the children.  The roadblocks to the parents' progress included that they put "all the blame on to outsiders" and denied that "anything had happened that would have put these children at risk."  Respondent may have missed one or two sessions with him, but "nothing substantial."  Leo provided care until June 1999.  The termination of services was due in part to the DCFS goal change from return home to substitute care, which occurred in December 1998 or January 1999.  Near the end of Leo's sessions with the parents, respondent began to open up "in terms of some of her feelings of sadness that their children were in care and that they looked like they weren't coming home." 

Leo never worked with the parents and children together; however, based upon his exchanges with others working on the case, Leo would not have recommended that either parent have unsupervised visits with the children in July 1998.  Nor would he have recommended that the children be returned to their parents' care.  

Annette Jordan, who had been the children's therapist for 3 1/2 to 4 years, testified that she regularly worked with DCFS in child welfare cases and that this case had been referred to her from DCFS.  On July 15, 1998, Jordan supervised a second family therapy session that Amy, Anna, and respondent attended.  April, Amy, and Anna had informed Jordan that they feared their parents.  The purpose of the session "was for the girls to become familiar with their parents because at that point the girls really did not want to do therapy with their parents."   Jordan described the July 15 session:

"The session began as Anna decided she was going to talk to her mom about a specific growing pain she was experiencing because she wanted her mom to understand she was getting better in some of the things that she was going through.  So, as she started the session, you know, she turned to her mom and she got about (10) words out of her mouth when [respondent] jumped up and walked out of the session.  While she was gone, I began to talk to the girls to kind of process what was going on; and [respondent] came back."

Before respondent left the session, Anna had said that one of the other girls in the foster home had "tapped" her and she "was allowed to tap [the girl] back."  Respondent was visibly angry when she left the room.  "[S]he was irate.  She just jumped up, *** you could see the anger on her face so she jumped up; pushed her hair back; and ran out [of] the room."  She was gone for about four or five seconds and then returned with Dvorsky.  Inside the room, she "pointed in Anna's face and said:  'Now you tell me the truth; not what they have brainwashed you to say.' " Jordan told respondent that her behavior was inappropriate, but respondent turned again to Anna and said, " 'You tell me the truth; not what they brainwashed you to say.' " Dvorsky and Jordan spent about three minutes trying to explain to respondent that her behavior was inappropriate.  Jordan explained:

"[W]hat she was doing was intimidating her children.  She was telling her children that the therapist (and she was referring to me) was brainwashing [them] -- the foster mom was brainwashing [them]. *** [S]he was not listening to anything that they were saying at all, I mean, she was not being empathetic to her children at all.

***

She was not listening to anything they say [
sic
].  She could not hear.  She was just on her own course."  

Jordan suspended the session that day after only 30 minutes because it was inappropriate.  Jordan also recommended that all family counseling sessions be stopped at that time 

"[b]ecause during the session [she] observed Amy and Anna both shutting down.  Amy shut down to the point where she just began to bang on a toy.  She just kind of went to outer space.  April just kind of said: 'Forget it.'  After the session all (3) of the kids just told [Jordan]: 'She's going to be back and tell my dad;' and, you know, 'You can just forget it.  We don't want to go back.' " 

Specifically, April expressed that if respondent told Ernie C. what had happened, she would be in "big trouble," which to her "meant that she was going to be punished in a way that she could not explain."  The children expressed fear of both their mother and father to Jordan, and although the sessions went "a little better" without Ernie C., "[t]he kids were still fearful.  The kids still struggled when talking to their mother ***" because "they did not feel that their mother heard what they said."  Jordan admitted that she never saw respondent physically touch any of her daughters in any of the sessions or hit her daughters outside the sessions.  Respondent showed up for all sessions.

Linda Burke testified that she was respondent's individual therapist at Mary and Tom Leo and Associates.  She testified as an expert in counseling, child welfare, child abuse, and child neglect.  She initially met with respondent in October 1997, but regular individual sessions did not begin until January 1998.  Burke conducted approximately 11 individual sessions with respondent through August 1998.  She participated in approximately 20 joint sessions with respondent and Ernie C. between November 1997 and December 1998.  The primary goals for respondent were "to address the issues that were detailed in the psychological evaluation -- to assess her treatability; to assess her relationships with the children and her husband individually; [and] to help her to talk about the issues that brought the children into the system individually."  These same goals were the focus of the joint sessions with Ernie C.  

During the nine-month period from October 1997 through July 1998, Burke was only "minimally" able to develop a therapeutic relationship with respondent.  She explained:

"It was very difficult to engage a relationship with [respondent] because of how highly dependent she was and defensive.  It was extremely difficult for her to move beyond her anger and her upset about DCFS' involvement.  She had a real hard time seeing herself as a parent who has been involved with DCFS.  She consequently talked about herself in terms of being a good parent that really loved her children; and I know she was very sincere about that and compared herself to parents who were involved with drugs or who abused their children; and consequently, how she was even considered a parent that had to be involved with DCFS. She felt like there had been mistakes made that they were being punished for -- the mistakes that she had been punished long enough; and that she needed to have her children returned to her care.

***

[Respondent] consistently went always back to, you know, 'We made a mistake.  There is [
sic
] no problems.' They was [
sic
] angry about having to be in individual and marital therapy.  She didn't see a need to be in therapy.  She was willing to cooperate; to do whatever she needed to have her children returned; but she had difficulties seeing the issues and the need to talk about them."

Burke had hoped to address a number of issues with respondent: (1) why the children came into care; (2) the issues raised in the psychological evaluation and the bonding assessment; (3) the history of domestic violence; (4) respondent's ability to protect the children; and (5) possible sexual abuse.   Respondent was able to talk about discipline and "to a limited degree about sexual abuse and the red flags," but she was reluctant "to talk specifically about what the allegations were."  Respondent was also able to talk about parenting skills and her relationships with her daughters "in terms of everyday activities."  

Burke explained that the psychological evaluation reported that respondent was "very concrete in her thinking and very rigid and defensive."  The suggested mode of therapy was cognitive behavioral therapy, which focuses on the "way a client thinks about an issue and [helps] them make changes in the way they think about an issue as opposed to the way they have insight or intellectual understanding about a problem."  One of the ways Burke attempted the therapy was by emphasizing respondent's spirituality because religion was very important to respondent.  Burke tried to teach respondent to manage her anxiety through prayer and to stay focused on her children.  She instructed respondent how to deal with issues that came up in family sessions and how to relate those issues to the children.  Burke attempted to teach respondent that if she was upset about other issues, she should not bring them up during the family session; instead, she should save those issues for her individual sessions or she should talk with a caseworker outside the family sessions. 

Burke stated that during her treatment of respondent, she considered whether respondent would be capable of caring for the children by herself, and she was concerned that respondent would not be able to take care of the girls by herself.  Burke would not have recommended that respondent have unsupervised visits with the children.  Nor would she have recommended that the children be allowed to live with respondent "[b]ecause she hadn't resolved the issues that brought the children into care," which put the children at a continued risk.  Also, Burke felt that respondent should not have custody of the children because she had remained with Ernie C., who was a threat to the children.

Burke observed that respondent did not trust the caseworkers and therapists working on the case.

"[Respondent] was very concerned that the children were being brainwashed.  She was very concerned that the caseworker and the therapist and the foster mother had changed -- turned the girls against the parents; and because of that, she felt like she would not be welcomed[.] *** [S]he felt like she wouldn't be received or believed or understood."

Respondent testified that she had been employed by Medex Transportation for about three years.  Her job involved transporting people to and from the hospital.  After her children were taken from her custody, respondent and Ernie C. went to West Side Holistic for counseling.  They had been referred there by someone they knew at church.  LeRoy Yates, who was not a licensed clinical social worker, provided the couple with joint and individual counseling.  Eventually respondent was advised to seek counseling from a different, qualified source.  

Respondent's initial visits with the children were supervised by Passages.  Hephzibah later supervised the visits.  Lisa McDonald of DCFS recommended that respondent undergo a psychological evaluation and get therapy.  Respondent did both.  Respondent claimed that she cooperated fully with all requested services during the pendency of the case and that she never missed a visit with her children.  

When she first met with Dvorsky in September or October 1997, respondent began to feel as if her efforts were being ignored.  Based on that meeting, she began to suspect that "no matter what they said on paper about reunification -- on getting back together, it was going the opposite direction."  She felt that Dvorsky and her assistant were very discouraging.  At the meeting, respondent asked Dvorsky if she and Ernie C. could spend a weekend night with the children in December and Dvorsky responded, " 'I'm sorry, but that won't be for a long, long time.' " This remark led respondent to believe that everyone was working against return of the children.

During a family session in July 1998, Anna started talking to respondent and told her that she had been in a fight with one of the foster children in her home.  Respondent asked whether Anna had spoken with the foster mother about it.  Anna explained that she had and that the foster mother told her " 'to lick her back.' " Respondent described her reaction:

"I got upset.  I said: 'Excuse me, but I have to leave the room.'  I left the room.  I went to the supervisor of Hephzibah.  I said: 'I do not understand how the foster parent could give this direction to my daughter when we don't want our children to hit other children; when they have brought us into the system saying there is corporal punishment; and they're sending us to classes for corporal punishment; and the foster parent [is] telling my daughter to lick back the other child.' "

The incident made respondent "very angry."  She returned to the session and "got quite negative."  
She said some things that may have upset Jordan.  
She admitted that she might have told Anna to tell the truth and not what she had been brainwashed to say.  She claimed, however, that she was not yelling; instead, she was just "complaining."  She said she did not raise her voice or shake her finger at her daughter.  Respondent claimed she apologized to Jordan and the children.

Respondent admitted that near the start of her therapy sessions with Burke she was "kind of negative towards [Burke]; but then after -- towards the middle part -- towards the end [respondent] kind of understood where [Burke] was coming from and [respondent] accepted her, but it was a little too late then."   Respondent completed two parenting classes.  She attended all requested therapy sessions and completed a psychological and psychiatric examination.  Prior to her involvement in this case she had never had any therapy or counseling before.  

At the time the children were removed from respondent's custody, April was 11 1/2 years old, Amy was 6, and Anna was 8.  Respondent had five different attorneys during the progress of the case.  She said she remained with Ernie C. because, at the November 1997 DCFS staff meeting at which Tom Leo, Chris Benson from Hephzibah, and Lisa McDonald were present, she inquired whether she and Ernie C. should separate "so that he could leave the state, and [she] could have the children," and she was told that she should not separate from Ernie C.

Respondent maintained that since the time her children were removed from her custody she had wanted to regain custody, but she thought that her visits with her children were strained.  She explained:

"[E]very time we had a visit with our children, they had workers in there writing down what we were doing; what songs we were listening to -- interpreting this and that about our life.  And, it was like going to visit your children in jail; like you see on the TV where you visit an inmate.  It was nothing natural about having a visit with your children in a room where people are writing down -- looking for things; and writing things down.  There was nothing natural about that."

She claimed she was not able to naturally interact with her children because she was being watched.  She said these problems did not occur when Passages supervised the visits because the supervision was less intense than that conducted by Hephzibah.  

During the pendency of the case Ernie C. went to California for about two weeks, but returned to live with respondent thereafter.  Ernie C. lived with her until the end of 2001 or beginning of 2002.  Respondent claimed that during her counseling with Leo, she told him that she wanted to separate from Ernie C. in order to get her children back, but he told her it was not necessary.  She claimed that all of her lawyers and therapists and Lisa McDonald told her to stay with Ernie C. or, at least, "never mentioned about leaving so [she could] get [her] children back."  In any event, respondent admitted that it was important to her that the children have a father in their home "because in today's society there's no fathers -- just women, children; no men in the home."  Respondent claimed she did not know where Ernie C. was and that it had been "a long time" since she had last seen him.

In June 1998, respondent gave the girls a letter from Ann Finney, Ernie C.'s sister, who lived in California.  Respondent wanted to send the children to California to live with Finney, but she claimed it was not her intent to have the girls live in California so she could go live there with them. 

The juvenile court found that respondent had made reasonable efforts to correct the conditions that brought the case to court and, therefore, was not unfit under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(d)(m)(i)(West 2000)).  The court identified her reasonable efforts in this regard as attending the visits and counseling on a regular basis.  In fact, the judge remarked:

"[I]t isn't a lack of efforts on the part of the mother that is the problem in this case.  The problem that the Court sees as testified to by both Linda Burke and also Tom Leo is the fact that the mother made no progress during her time in counseling; that she virtually made no movement according to Tom Leo during this period of time; that the joint sessions were again sporadic and, as described by Linda Burke, that the mother would seem to defer to the father during these sessions and that -- and that the sessions virtually got nowhere; that and which there is nothing that could describe this more clearly than the visits.

The family therapy was instituted in July of 1998 approximately (9) months after the adjudication and approximately, well, (7) months to (8) months after the original counseling started with Tom Leo & Associates -- the testimony as to, described by Miss Jordan today indicating the fact that the mother cuts [
sic
] *** the therapy short and walked out the minute the youngest girl started telling the story about what had happened to her in the foster home -- the mother immediately got up and left. 

The Court must note for the record that it observed the mother and her demeanor in court here today testifying; and I must admit that she even appeared to become agitated while she told the story today in court which not only shows the depth of her feelings towards this; but this Court can only imagine what it was like -- what she was like when the minor originally started telling her what had happened; and what the Court must observe and take from this is that the mother showed absolutely no concern for the children during this. 

The only thing she was thinking about is [
sic
] her principles and her position in all of this (that she got up and left the courtroom [
sic
] and went to find a supervisor immediately) that's what her testimony was today.  There wasn't even any concern for whether the minor had been injured.  There wasn't a question to the minor:  Were you hurt during this fight or anything?  The first thought on the mother's mind was not any concern for the child whatsoever, but what her only concern appeared to be was to get up and leave and find a supervisor to complain.

*** [T]he mother even admitted here in court today that her concern was to find a supervisor and to vent her anger at the supervisor for the foster parent telling her child to hit the child back, and the Court finds that a very odd response; but, then, it was an appropriate response based upon what Tom Leo and what Linda Burke testified to was the mother's problems; and, as a matter of fact, it demonstrated that the mother had made no progress in being able to focus on her children's concerns as opposed to being focused on her predicament and her concerns; and this thing, I think, establishes beyond a reasonable doubt -- any doubt; and certainly based upon the mother's reaction here in court today in retelling the story that her concern is for herself and not for her child.

Not once did I hear anything involving if she was concerned about what had happened to the child.  She was concerned about what the foster parent was telling the child and how that contradicted what she had told the child."

The court found that respondent "showed no more concern in July of 1998 concerning her children than she did before this case had even come into court."  It concluded that respondent failed to make reasonable progress toward the return of her children within the nine-month period following adjudication, and thus, was unfit.  750 ILCS 50/1(D)(m)(ii)(West 2000).

The court also found that respondent was unfit for failing to maintain a reasonable degree of concern or responsibility as to the children's welfare.  750 ILCS 50/1(D)(b)(West 2000).  The court reiterated its findings with regard to respondent's lack of progress toward return home as additional support for finding that respondent failed to maintain a degree of concern or responsibility as to the children's welfare.  In doing so, the court pointed out that its emphasis on the July 1998 family therapy session should not be construed to mean that the incident was the sole basis for its finding of unfitness.  It emphasized that event only because

"[it] came at what would be considered about (9) months -- roughly (8) months after the counseling began; and it showed and it establishe[d] even more clearly and highlight[ed] the testimony of Linda Burke that the mother had problems focusing on her children and their concerns and in fact continues *** having problems focussing
 on the children's needs and concerns during this entire time of counseling that extended well beyond July of 1998 into 9/99 up until approximately July of '99; that the counseling was terminated and that the mother never did establish the type of concern -- to show the type of concern towards the minors that would indicate that she had made any progress at all in correcting the conditions that brought this case into court; therefore, the Court does find that the [S]tate has established by clear and convincing evidence that both parents are unfit; and there will be a finding of unfitness as to both parents."

Respondent urges us to reverse the trial court's finding of unfitness.  She claims she made reasonable progress toward return home because she attended and participated in all requested services.  The public guardian and the State argue that such evidence alone is insufficient to show reasonable progress and that the totality of the evidence shows that respondent failed even to make minimal progress toward return home.

"Parental unfitness must be proved by clear and convincing evidence."  
In re D.L.
, 326 Ill. App. 3d 262, 270 (2001).  "[F]or testimony to be clear and convincing, it need not be entirely void of discrepancies and unimpeached, so long as the testimony is consistent and the discrepancies do not detract from its reasonableness."  
In re Clarence T.B.
, 215 Ill. App. 3d 85, 103 (1991).  We accord the trial court's finding of unfitness great deference and will reverse only if the finding is against the manifest weight of the evidence.  See 
In re D.L.
, 326 Ill. App. 3d at 270.  "A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident."  
In re D.L.
, 326 Ill. App. 3d at 270; 
In re J.A.
, 316 Ill. App. 3d 553, 561 (2000)("A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent").  We defer to the trial court for factual findings and credibility assessments because it is in the best position to make such findings.  See 
In re D.L.
, 326 Ill. App. 3d at 269.  We "will not reweigh evidence or reassess witness credibility on appeal."  
In re D.L.
, 326 Ill. App. 3d at 269.  "Further, because each case involving parental unfitness is 
sui generis
, courts do not make factual comparisons to other cases."  
In re J.A.
, 316 Ill. App. 3d 553, 561 (2000).  

Under the Adoption Act, a court may find a parent unfit to have a child for a number of reasons, including:

"(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.

* * *

(m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or (ii) to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(West 2000).   

"[O]nly one ground of unfitness need be proved to find a parent unfit."  
In re J.A.
, 316 Ill. App. 3d at 564.  With regard to section 1(D)(m)(ii), under which the juvenile court found respondent unfit, "[r]easonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect from the parent under the circumstances."  
In re J.A.
, 316 Ill. App. 3d at 564.  At its very least, "reasonable progress requires measurable or demonstrable movement toward the goal of reunification."  
In re J.A.
, 316 Ill. App. 3d at 565. 

In this case, there was evidence from a number of sources that respondent denied any wrongdoing and declined to take any responsibility for the acts that led to the children being removed from her custody. Leo testified that respondent failed to take any responsibility for the children being in foster care and that she continued to maintain that she "didn't do anything wrong."  Burke testified that respondent "had difficulties seeing the issues and the need to talk about them."  She consistently claimed that there were no problems.  The evidence shows regression on respondent's part.  At the adjudication, respondent stipulated to the physical abuse.  Following that proceeding, she was in complete denial that there were any problems in her family.  This evidence alone could be sufficient to support the juvenile court's finding. See 
In re Clarence T.B.
, 215 Ill. App. 3d 85, 101 (1991)("[T]he appellate court has held that a parent's failure to acknowledge that sexual abuse has occurred and, therefore, failed to take steps to prevent the children's exposure to that abuse, is sufficient to support a finding of unfitness by clear and convincing evidence"). 

The evidence, however, shows more than that respondent failed to acknowledge or take any responsibility for the abuse that resulted in her children being removed from her custody.  The evidence showed that respondent often came to visits angry and spoke sarcastically and harshly to her children. She interrogated her children regarding the foster home and interacted very mechanically and in a forced manner with them.  She blamed all of her problems on her therapists, counselors, and DCFS.  She could not keep her focus on her children even during the brief visits.  She accused April of trying to break up the family because the child wished to attend a track meet.  Respondent failed to implement the skills she learned in the parenting classes and other specific instructions she was given (such as to attempt to give more attention to Amy).  Respondent's behavior was difficult to direct and manage at times, and she made inappropriate remarks to the children and attempted to communicate with them in secret by whispering.  Respondent intimidated her children.  Her conduct made the children afraid to open up to her and to see her.  Dvorsky, Handelman, and Leo testified that they would not recommend unsupervised visits or return of care to the parents.  Burke testified that she would not recommend unsupervised visits or return of care to respondent.   

Respondent argues that the juvenile court's ruling was based on the July 1998 incident and that her conduct on that occasion was "not so outrageous or unusual so as to constitute clear and convincing evidence of her unfitness."  She also claims that the trial court gave improper weight to the testimony that she was angry with the system and blamed DCFS and the counselors for her problems.  She relies on 
In re N.B.
, 191 Ill. 2d 338 (2000).  That case, however, involved an appeal of the trial court's finding of abuse.  Accordingly, it is not helpful in the instant case.  Regardless, the facts of that case are clearly distinguishable.  In 
In re N.B.
, the court held that the trial court's finding that the respondent raised her children in an "injurious environment" was against the manifest weight of the evidence because the evidence consisted of one incident in which the respondent directed her anger at health department employees and there was no evidence that the respondent abused or mistreated her children in any way or that her strong temper posed any risk of harm to her children.  
In re N.B.
, 191 Ill. 2d at 350-51.  To the contrary, here, respondent's anger was directed at the children.  For example, when Anna attempted to explain to her mother that she had been allowed to "tap" her foster sister, respondent left the room and then returned, yelling at Anna that she should tell her the truth, not what she had been "brainwashed" to say.  Respondent's behavior on that and other occasions caused the children to fear her and hold back from communicating with her.  Respondent's behavior prevented her from bonding with the children.  Further, unlike 
In re N.B.
, the juvenile court specifically stated that it was not considering only the July 1998 family session in its analysis.  There was significant other evidence of respondent's unfitness in this case.  For example, there was additional evidence that respondent had repeatedly received instruction on how to better interact with her children and that she failed to follow that instruction.  Additionally, respondent intimidated her children at times and spoke harshly and sarcastically to them.      

Respondent also argues that "[i]t is crucial and undisputed that respondent was never informed that she had to separate from her husband in order to have the children returned home to her."  She relies on 
In re R.B.
, 297 Ill. App. 3d 97 (1998).  In that case, the court reversed a finding of unfitness, which was based solely upon the mother's failure to separate from the father, because the mother was never advised that she would have to separate from the father before she could regain custody of her children.  
In re R.B.
, 297 Ill. App. 3d at 101.  That case is inapplicable to the instant case because there is no indication that the trial court gave any significant weight to the fact that respondent had not divorced Ernie C.  In fact, respondent testified at trial that Ernie C. did not live with her any longer and that it had been "a long time" since she had last seen him.  From the evidence, it is not clearly evident that the juvenile court's finding was wrong.  Thus, the court's finding that respondent was unfit because she failed to make reasonable progress toward return home within nine months after adjudication was not against the manifest weight of the evidence. 

Respondent also argues that the juvenile court's finding that she was unfit because she failed to maintain a reasonable degree of concern or responsibility was erroneous.  Having found no error in the juvenile court's first finding, we need not address this second contention.  See 
In re D.L.
, 326 Ill. App. 3d at 268 ("Evidence of one statutory ground is sufficient to support an unfitness finding, even if evidence is insufficient to support other grounds alleged"); 
In re M.S.
, 302 Ill. App. 3d 998, 1002 (1999)("[T]his court need not consider other findings of unfitness where sufficient evidence exists to satisfy any one statutory ground").  

As noted earlier, the second step in the involuntary termination of parental rights is the best interests hearing.  At that hearing, Georgette Adams-White testified that she was employed by DCFS and was the current caseworker for April, Amy, and Anna.  She had been their caseworker since March 1, 2001.  At the time of the hearing, the children were living with a nonrelative foster parent.  There were a total of seven children living in the home.  The foster mother was single and her mother  lived with her and the children in the home.  Adams-White visited the minors once or twice per month in the foster home.  She indicated that the children "appeared to be happy in the home."  April, Amy, and Anna had "[v]ery good interaction" with their foster mother, they called her "mom," and seemed to have close relationships with her.  April, Amy, and Anna's interactions with the other children in the foster home involved "[r]egular sibling rivalry," and all the children appeared to "get along well."  There were some minor problems in the home, but it was Adams-White's opinion that the foster parent was taking good care of the children.  

There had been no unusual incidents relating to the health or safety of the minors while in the foster home.  Adams-White had no concern that the foster home was not an appropriate home for the children.  In the foster home, two of the children shared a room with each other.  The third shared a room with a foster sister about her same age.  The children were "doing pretty good" in school.  Adams-White was aware of only one incident when the children had any contact with either of their parents since June 1999.  It was an unauthorized visit by their mother.  Adams-White admitted that Amy was acting out sexually and stealing from the foster home.  April had also stolen from the foster home, and the foster mother did not trust April to date.  Amy had enuresis when she entered foster care, but her condition had improved.  Anna and Amy were on the honor roll at school, and April was taking honors Spanish.

The children had special needs.  April was taking Zoloft and lithium for depression.  She had recently been hospitalized for psychiatric problems and was released just days before the hearing.  Adams-White spoke to April during her hospitalization, and April indicated that she wanted to return to the foster home.  April was released to the foster home, and Adams-White believed that to be an appropriate placement for April.  April also saw a psychiatrist regularly and had counseling with Jordan twice a week.  

Amy was on lithium and Paxil for depression.  She was also being treated regularly by a psychiatrist and receiving counseling from Jordan.  Three weeks prior to the hearing she had been hospitalized for psychiatric problems.  She was released to the foster home, and Adams-White believed that was an appropriate place for Amy to be.  Adams-White believed that Amy's examination revealed signs of sexual abuse, and she knew that Amy and Jordan were working on sexual abuse issues in counseling.  

Anna was in special education classes and was taking Effexor for receptive-expressive disorder.  She was also being treated regularly by a psychiatrist and was receiving counseling from Jordan.  Adams-White indicated that in the event the girls were adopted, Jordan would continue to provide counseling services.

Adams-White had ongoing conversations with the children regarding adoption.  She believed that the reason the children were upset and things were escalating was because they were tired of waiting for adoption.  In fact, the children's psychiatrist indicated that at least some of their psychological problems might be the result of their anxiety about the delay in adoption.  Adams-White described that the girls really wanted to know when the case would be finished, but she had been unable to give them an answer.    

April told Adams-White that she wanted to be adopted and she wondered why it was taking so long, especially since her foster mother had adopted other children in the meantime.  Adams-White believed Amy wanted to be adopted by her current foster parent. Amy told Adams-White that she was "upset about the adoption taking so long, and she [was] wondering if it [would] ever happen."  Anna, as well, told Adams-White that she wished to stay in the foster home and be adopted.  The foster mother told Adams-White that she would like to adopt the children.  Adams-White recommended that the parents' rights be terminated.  Upon termination, she would recommend that the foster mother be allowed to adopt the children.  She believed it to be in the children's best interests "[b]ecause they have been in her home since 1997.  And they have a bond and they want to be adopted by her.  And they ha[d] repeatedly told [Adams-White] that."  

Respondent also testified at the hearing.  She indicated that none of the children had any psychiatric problems when they were in her custody.  They had regular medical checkups from birth until they were removed from her custody.  The children had never been prescribed any psychotropic medications while in her custody.  She had never noticed any of the children acting out sexually while in her care.  Amy had a problem with taking clothes from the house to school when she lived with respondent, but respondent was not aware that any of the children were stealing.  Respondent stated that she did not believe it was in the children's best interests to be adopted.  She explained:

"I love my children.  I have always been a good mother to my children.  My children know I love them.  I have never hurt them in any way.  Not physically, mentally, not any way.  I have been a very good mother."

Respondent still failed to recognize that the children had been abused while under her care.  She claimed that such accusations "must have been coerced by [the children's] therapist."  Respondent admitted that she saw the children in mid-2000 in violation of the court's order.  She denied that it was her intent to take the children that night.  

The juvenile court found that it was in the children's best interests to terminate respondent's parental rights and allow adoption.  It explained:

"[W]hat is obvious to this Court is that these children are suffering from some severe anxiety, anxiety over the prospect of not being adopted and the prospect of maybe seeing their parents again.

The mother, as she testified to here today, is in complete denial that anything occurred that was her fault in the least that caused the children to be removed from her care.

*** [S]ome of their *** problems I fear have been caused by the delay in these proceedings.

As the worker testified to here today, that the -- that the children's only therapist and the psychiatrist who hospitalized the two children indicated that it is severe anxiety over the legal proceedings. *** [And] the longer the children are placed in limbo, *** the more severe their anxiety becomes over their future because they don't know what their future is.  And every time they have asked this worker what the future is, the worker can't tell them unfortunately.

* * *

The testimony is clear that these children have been in this home of numerous years and that they are being well-cared for there.  And the anxiety over their future is one of their main problems.

***

The Court also finds that these children are being well-cared for by this foster parent and that it is an appropriate home and that they are receiving all appropriate care."

Respondent argues that the juvenile court erred in finding that it was in the children's best interests to terminate her parental rights because the minors were having behavioral and psychiatric problems in the foster home and because the foster parent was a single parent with four other children.  The public guardian and the State contend that the juvenile court considered the totality of the evidence and appropriately concluded that it was in the children's best interests that respondent's parental rights be terminated.  

Once a trial court makes a finding of unfitness, it is within its sound discretion to terminate parental rights.  
In re B.S.
, 317 Ill. App. 3d 650, 664 (2000).  We will not reverse the trial court's decision to terminate parental rights absent an abuse of discretion.  
In re B.S.
, 317 Ill. App. 3d at 664.  In making that determination, we may consider respondent's actions following the initial nine months after adjudication of abuse and wardship even though the finding of unfitness was based in part upon progress during that nine-month period.  See 
In re J.A.
, 316 Ill. App. 3d at 564 ("If a parent is found unfit under subsection (m), evidence of the parent's conduct occurring more than nine months after the adjudication of neglect may be introduced at the second stage of the termination proceedings, at which the court must consider the best interests of the minor involved in determining the youth's eventual placement").  There are a number of factors that must be considered in determining the children's best interest:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing; 

(b) the development of the child's identity; 

(c) the child's background and ties, including familial, cultural, and religious; 

(d) the child's sense of attachments ***; 

(e) the child's wishes and long-term goals; 

(f) the child's community ties, including church, school, and friends; 

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; 

(h) the uniqueness of every family and child; 

(i) the risks attendant to entering and being in substitute care; and 

(j) the preferences of the persons available to care for the child."  705 ILCS 405/1-3(4.05)(a) through (j)(West 2000).

In this case, it was not an abuse of discretion for the juvenile court to find that based on the totality of these considerations it was in the children's best interests that respondent's parental rights be terminated.  As respondent argues, it is true that there were some problems in the foster home, but most of those were attributed to the lengthy delay in permanency for the children.  The evidence showed that the children have a substantial need for permanency and continuity of relationships.  Further, the court found that the foster parent provided appropriate and stable care for "numerous years."  As well, there was evidence that the foster mother desired to adopt the children, that their therapy would continue post-adoption, and that the children had built relationships with their foster family.  Under these circumstances, it was not an abuse of discretion for the juvenile court to find that it was in the children's best interests to terminate respondent's parental rights.  

For the foregoing reasons, we affirm the juvenile court's finding that respondent was unfit to parent the minors because she failed to make reasonable progress toward their return home within the nine months following the adjudication of abuse.  Additionally, we affirm the juvenile court's termination of respondent's parental rights because it was not an abuse of discretion for the court to find that such termination was in the children's best interests.

Affirmed.

GORDON and McNULTY, JJ., concur.