NOTICE

Decision filed 10/11/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220333-U

NO. 5-22-0333

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MI'KAYLA H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
|     Petitioner-Appellee, | ) | No. 21-JA-71 |
| | ) | |
| v. | ) | |
| | ) | |
| Danesha B., | ) | Honorable |
| | ) | Brett N. Olmstead, |
|     Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's adjudicatory order finding the minor child neglected was not against the manifest weight of the evidence. The circuit court's dispositional order granting guardianship to the Illinois Department of Children and Family Services was not an abuse of discretion.

¶ 2    The respondent mother, Danesha B., appeals the Champaign County circuit court's adjudicatory order finding Mi'Kayla H. neglected and the dispositional order finding that it was in Mi'Kayla's best interest to grant guardianship to the Illinois Department of Children and Family Services (DCFS). For the following reasons, we affirm.

1

¶ 3                    I. BACKGROUND

¶ 4    Danesha is the biological mother of Mi'Kayla H., born January 14, 2020. Mi'Kayla's putative father, Michael, is not a party to this appeal and will only be discussed as necessary to provide relevant background for the issues presented.

¶ 5    On September 27, 2021, Mi'Kayla was burned on her face and upper arms when an iron fell on her. Danesha and Michael took Mi'Kayla to Lurie Children's Hospital of Chicago (Lurie) for treatment. The Lurie medical records indicated that Michael interfered with the medical providers' treatment of Mi'Kayla by refusing to allow certain treatment and refusing to consent to her transfer to the burn center at Loyola University Medical Center (Loyola). After "[s]ocial services and security [were] asked to assist in order to ensure [a] safe environment to provide care," Michael's "disruptive behavior escalated." "Police [were] called and [Michael was] escorted out" of the emergency department. Danesha remained at the hospital and consented to Lurie's recommendation to transfer Mi'Kayla to Loyola for further burn care. The Lurie records further indicated that the family lived in Champaign, Illinois, and were visiting Chicago.

¶ 6    On October 4, 2021, the State filed a three-count petition for adjudication of abuse, neglect, or dependency pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)), alleging that Mi'Kayla's environment was injurious to her health because (1) the child was exposed to domestic violence, (2) the child was exposed to the effects of Michael's mental illness, and (3) the child was exposed to Michael's erratic behavior. The petition was supported by a DCFS shelter care report.

¶ 7    The shelter care report addressed Michael's behavior at the hospital and indicated that the underlying reason for Michael's interference was that he believed his privacy rights under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Pub. L. No. 104-191

2

(2016)) were being violated. The report further noted that following Mi'Kayla's transfer to Loyola, Michael asked why Champaign DCFS was involved and advised the agency that the family moved to Chicago six months earlier. In order to determine the child's residence, DCFS attempted to contact Danesha. Michael answered the telephone call and denied DCFS's request to take the telephone off speaker. In response to DCFS's question regarding residence, Danesha stated they no longer lived in Champaign, but she had not yet changed her address. Danesha further stated they moved to Chicago two months earlier.

¶ 8      The Champaign County DCFS office then enlisted assistance from the Cook County DCFS office to determine the actual residence of the child. DCFS also received a call from the social worker at Loyola's burn unit reporting that the physician "wanted a full work up" but the parent was "denying blood work and a skeletal exam." The social worker further reported that Michael's behavior had been aggressive, and he was not allowed back in the hospital. After obtaining Danesha's prior Champaign address, DCFS went to the address and left an agency card at the door.

¶ 9      Upon return from the alleged Champaign residence, DCFS called Danesha on her personal cell phone. At that time, Danesha admitted lying to DCFS and stated she had done so because Michael told her that DCFS would take the baby if she did not say what he told her to say regarding where they lived. She further confirmed that she gave consent for Mi'Kayla's skeletal x-ray and blood work, both were performed, and she was waiting on the results. Danesha stated that she and Mi'Kayla lived in Champaign, and only they lived at the residence. As to Michael, Danesha stated she wanted him to stop telling stories because she needed him by her side during this time. She further confirmed that Michael had been kicked out of both hospitals.

¶ 10     The DCFS report indicated that it later received a telephone message from Michael stating:

"Hey how are you doing *** this is [Michael], ah, I am here at the home in Champaign Illinois ***, I just received your card in the door, ah, I'm here at the house if you want to come have the interview, that would be fine, you can get ah, walk around the house, just checking everything, if you can, please give me a call back *** thank you."

¶ 11 The shelter care report further indicated that on September 30, 2021, the agency was advised that the minor was ready for discharge and the agency advised the hospital social worker that it would be taking protective custody of the minor. After securing placement, DCFS called Michael and advised him of the shelter care hearing. Michael stated he would not be there. When DCFS stated that it wanted to meet with him so he could sign the notice, Michael stated he was "not signing anything" and further stated he was "not on the birth certificate and *** [did] not have to be there." When DCFS advised Michael that he previously stated he was on the birth certificate and was the father, Michael again stated he was not on the birth certificate. Michael then raised numerous legal issues, none of which are relevant here, and was told the agency did not give legal advice. The report further indicated that the agency advised Michael that his 31 calls to the agency that day were very disruptive and to simply call and leave a message. The shelter care report concluded by recommending the court find that immediate and urgent necessity, exigent circumstances, and probable cause existed. The report further recommended the court find it was in the child's best interest to be temporarily placed with DCFS, order supervised visitation between Danesha and the child, and suspend visitation between Michael and the child.

¶ 12 The shelter care hearing was held on October 4, 2021. Danesha appeared and counsel was appointed. Michael did not appear. The State provided a factual basis that addressed Michael's behavior at the hospital and further stated the family had a history of domestic violence. The State also indicated that Michael's mental health was brought into issue in a 2018 traffic case, but noted

4

that case was dismissed, and the file destroyed. The guardian *ad litem* and Danesha stipulated to probable cause. Thereafter, the court found probable cause on counts I (domestic abuse) and III (Michael's alleged erratic behavior) but denied count II (Michael's alleged mental illness). By agreement of the parties, temporary custody was to remain with Danesha; however, the court found that immediate and urgent necessity required temporary removal of Michael's custody and supervised visitation by an agency employee or DCFS-approved party. The adjudicatory hearing was set for December 28, 2021, but ultimately occurred over the course of several days.

¶ 13    The first day of the adjudicatory hearing was held on December 28, 2021, but the entire time allotted for the hearing was spent addressing Michael's right to have counsel appointed. The adjudicatory hearing was continued to January 3, 2022; however, Michael did not appear. After unsuccessfully attempting to contact Michael by telephone, the hearing was continued.

¶ 14    The next day of the adjudicatory hearing was on February 7, 2022. Following another long discussion regarding Michael's right to counsel, the case eventually moved forward. The State called DCFS investigator, Catherine McGlone. She testified about receiving the report from the Chicago hospital, Michael's statements about living in Chicago, the numerous telephone calls Michael made to the agency requesting legal advice, and Danesha's statement that Michael forced her to lie about the location of her residence. Ms. McGlone further testified that Michael repeatedly stated that Mi'Kayla was not his child.

¶ 15    The State next called Danesha who testified about the hospital incident and further stated that she lied about her address because of statements made by Michael. The State submitted medical records from the Chicago facilities, and Michael objected. The objection was overruled except for exhibit 3, which contained uncertified records from Loyola.

¶ 16    Thereafter, the State called Michael to testify at which time he stated that he was homeless and living on the street. He stated that he did not recall and did not know if he was Mi'Kayla's father and further disputed the events at both Chicago hospitals. The State rested.

¶ 17    Thereafter, Michael stated he wanted to call himself as a witness. Due to time constraints, the adjudicatory hearing was continued until March 7, 2022. On that date, Michael called DCFS caseworker, Kevin Barnett. Following Mr. Barnett's testimony, Michael advised the court that he wanted to call Danesha as his next witness, and a recess was taken. When court resumed, it was determined that insufficient time remained, and the hearing was continued to March 29, 2022.

¶ 18    On March 23, 2022, the State filed a supplemental petition for adjudication. The petition alleged Mi'Kayla was neglected because she was in an environment injurious to her welfare due to Michael's mental illness.

¶ 19    The next day of the adjudicatory hearing was held on March 29, 2022. Michael called Dr. Lawrence Jeckel to testify. However, prior to Dr. Jeckel testifying, the court addressed the State's supplemental petition and, after hearing the arguments, took the matter under advisement. Thereafter, Dr. Jeckel testified that he was a psychiatrist, a forensic psychiatrist, and a consultant to the courts in Champaign County. He stated that he examined Michael on September 18, 2019, related to Michael's fitness to stand trial in a different case. He explained the process for preparing the report and stated that Michael's counsel in an unrelated case requested the evaluation. Dr. Jeckel ultimately opined in the unrelated case that Michael had a personality disorder characterized by faulty thinking, was not fit to stand trial, and recommended Michael be evaluated either on an outpatient basis or in an inpatient psychiatric unit.

¶ 20    On cross-examination by the State, Dr. Jeckel advised the court of his education and background, and the State tendered him as an expert witness in the areas of both psychiatry and

6

forensic psychiatry. Only Michael objected; however, the basis of the objection was unclear, and the objection was overruled. Dr. Jeckel explained that a personality disorder was an "enduring pattern of inner experience and behavior that deviate[d] markedly from the average." This meant "that the person ha[d] defects in cognition[,] thinking[,] and affect and maybe impulse control and interpersonal functioning." He stated the pattern was "inflexible and enduring." "[E]nduring" being the "key word" because those kinds of problems would bring conflict with occupations, legal proceedings, and social interactions. Dr. Jeckel believed that Michael had those inflexible and enduring patterns now. He agreed that Michael's obsession with his rights was a symptom of his personality disorder because Michael's "inordinate focus on grievance" was part of his personality disorder. He assumed the diagnosis would cause issues with Michael's relationships with DCFS.

¶ 21    Based on his 2019 examination, Dr. Jeckel opined that Michael's diagnosis would interfere with his ability to make sound decision making regarding Mi'Kayla's health care. He explained that Michael could not make logical connections that would enable him to have rational communication with another person. Dr. Jeckel opined that Michael's condition was unlikely to improve without treatment. Based on the physician's interactions with Michael in court earlier, he opined that Michael continued to show the same kind of faulty thinking seen in 2019. Following Dr. Jeckel's testimony, the case was continued to allow Michael to subpoena and present testimony from another physician. On April 1, 2022, the circuit court issued an order for genetic testing directed to Michael, Danesha, and Mi'Kayla.

¶ 22    The last day of the adjudicatory hearing was April 19, 2022. Michael called Arnold Black, the DCFS supervisor of investigators. Mr. Black testified about how the case came to DCFS and the agency's intent to investigate Michael's actions at the hospital. Following Mr. Black's

7

testimony, Michael wanted to call Cathy McGlone as a witness but ultimately did not. He further advised the court that he was unable to present his proposed physician witness testimony.

¶ 23 Following the close of evidence, the circuit court advised that it was allowing the State to proceed with the supplemental petition alleging that Mi'Kayla was neglected because she was in an injurious environment due to Michael's mental illness. The parties presented closing argument and thereafter, the circuit court found the State failed to prove count I (domestic abuse) but proved count III of the original petition and count I of the supplemental petition to find Mi'Kayla neglected. In support, the court found that Michael had disorganized thinking and focused on all the wrong things based on Dr. Jeckel's testimony as well as Michael's presentation in court. The court ordered DCFS to prepare an investigation and report detailing the mental and physical history of the child, the family situation, and other relevant information deemed appropriate. The court further ordered the parties to cooperate with the preparation of the report which included interviews and signing authorizations to release information.

¶ 24 The circuit court stated it would issue a written decision for the adjudicatory hearing and set the matter for a dispositional hearing on May 17, 2022. The circuit court's written order found that Mi'Kayla was abused or neglected as defined by section 2-3 of the Act (705 ILCS 405/2-3 (West 2020)) in that the minor was in an environment that was injurious to the minor's welfare as defined by section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)). The court's hand-written support for the findings stated:

> "Respondent father Michael *** exhibits defective thinking that obsessively distracts his focus to unimportant personal grievances, and this obstructs his ability to manage any crisis situation for the minor. On September 27, 2021, this defective thinking[,] and the erratic behavior it causes[,] resulted in [Michael] obstructing and delaying

8

emergency medical care for the minor to treat serious burns. Ultimately, he had to be forcibly removed from the hospital so the minor could obtain the treatment she needed and the transfer to a burn unit that she needed. [Michael's] obstruction of necessary care was not based on an assertion of religious belief, but instead was based on an irrational fixation on perceived violation of protocol (his claim that too many people were in the room) and HIPAA.

Respondent mother [Danesha] cannot safely manage [Michael's] defective thinking. Her inability to step in when this problem threatens the minor's health and welfare was one reason why [Michael] was forcibly removed from the hospital, and later, when DCFS became involved, his influence caused her to lie to the investigator initially.

Also, [Michael's] defective thinking was not a one-time aberration. It is a chronic problem that was on display through his later interactions with the DCFS investigator (for example, when he kept asking about HIPAA and legal issues instead of focusing on his child). [Michael] testified that he is homeless and living on the street which is consistent with life problems that his defective thinking naturally would cause. Also, DCFS entered an indicated finding for [Michael] interfering with emergency treatment for the minor.

Finally, [Michael] called as a witness, Dr. Lawrence Jeckel, a well-qualified forensic psychiatrist who examined [Michael] in relation to an earlier unrelated case. Dr. Jeckel observed defective thinking exactly like what [Michael] exhibited during the events on September 27 and after. While Dr. Jeckel's testimony was essential for a diagnosis, namely Personality Disorder, and the State's proof of Count I of the Supplemental Petition filed on 3/23/22, Count 3 of the original Petition filed on 10/04/21 was proved even without his testimony."

9

¶ 25    On May 11, 2022, DCFS filed an emergency motion for court order. The motion alleged that the assigned caseworker participated in an integrated assessment interview with Michael on April 22, 2022, but Michael called the caseworker seven days later and canceled his consent to use his information in the report. On May 12, 2022, DCFS filed its dispositional report without information from Michael's integrated assessment.

¶ 26    The dispositional hearing was held on May 17, 2022. The court first addressed DCFS's emergency motion. After Michael stated he could not read, the court ultimately stated the court would not rely on the dispositional report and stated live testimony would be used as the basis of the dispositional hearing.

¶ 27    The State called DCFS caseworker, Kevin Barnett. Mr. Barnett stated that Danesha moved to Du Page County after the shelter care hearing. She was originally living with family but now had her own residence. Mr. Barnett confirmed that Danesha's residence was safe based on previous walk-throughs. He saw the minor once a month and each time the minor appeared well-nourished and safe. He expressed no safety concerns when the minor was in Danesha's care. Mr. Barnett stated that Danesha completed the integrative assessment on April 28, 2022. She was cooperative and disclosed that she had concerns about Michael's mental health and the impact his mental issues would have on his ability to parent. She also expressed a belief that she and Mi'Kayla would be safer and better off without Michael in their lives. Danesha was referred to services that included individual counseling, therapy, and parenting classes. Mr. Barnett testified that Danesha was compliant with all services and her progress report was a "glowing report." Mr. Barnett was unaware of any other necessary services and confirmed Danesha maintained temporary custody of Mi'Kayla and was ensuring that the minor's medical care and other needs were met.

¶ 28    Mr. Barnett also addressed Michael's integrated assessment performed via telephone on April 22, 2022. Limited to the issues relevant here, the testimony advised of conflicting locations for Michael's residence, his mental health, education, employment, and criminal histories. Mr. Barnett stated that Michael wavered between avowal and disavowal of parentage and refused to participate in genetic testing. As to services, Mr. Barnett testified that Michael refused to sign the paperwork necessary to participate in those services and further stated he did not want the services.

¶ 29    Following Mr. Barnett's testimony, the State asked the court to take judicial notice of all prior orders in the case as well as Dr. Jeckel's testimony at the prior hearing. Thereafter, the State rested. The guardian *ad litem* and Danesha's counsel declined the opportunity to present evidence.

¶ 30    Michael called Danesha to testify. Danesha stated she did not know what mental health issues Michael had. She did not know if the baby would be safe with Michael due to mental illness but stated she and the baby were not unsafe around Michael. She did not feel that Michael had mental illness at the hospital. She stated she was emotional at the hospital. She did not think she had a mental illness because she was emotional. She could not remember if the caseworker told her to call the police after the last hearing if Michael came around. She stated she was not dating Michael. She disputed ever stating that Michael had a mental illness and reaffirmed that she thought she and the baby would be safe around Michael.

¶ 31    On cross-examination Danesha was questioned about the differences between the statements she provided to Mr. Barnett and her current testimony. Danesha stated that she did not know if Michael had a mental illness and "[n]o one knew." When asked about her prior statement that she and Mi'Kayla would be better off without Michael, Danesha stated she did not know if she would be. She stated that she did not think Michael would hurt Mi'Kayla and confirmed that when the case closed, her goal was to co-parent with Michael.

11

¶ 32    The court also questioned Danesha about her answers. Danesha stated that she believed Michael had some mental health issues, but she did not know if that made him a dangerous caregiver to Mi'Kayla. When questioned by Michael, Danesha stated that she did not know he had mental health problems until court when Dr. Jeckel testified. She never noticed anything about his mental health at home or with the baby.

¶ 33    Danesha's counsel asked if Danesha felt it was safe right now to leave Mi'Kayla alone with Michael and Danesha replied, "No." Michael then asked if Danesha ever observed him engaging in faulting thinking. Danesha stated she did not know what "faulty thinking" was. She denied stating that she believed Michael had mental health issues because she believed it was what DCFS wanted to hear. She further denied saying Michael had mental health issues to retain custody of the child. She stated that she was not nervous "at any time" when Michael was with Mi'Kayla.

¶ 34    When asked by the State why she did not believe Mi'Kayla would be safe with Michael now, Danesha responded, "Actually, I don't know." When asked what she did not know, Danesha replied, "If she would or not." She was then asked if she did not know if Mi'Kayla would be safe or not with Michael. Danesha responded, "I mean, I don't think he would hurt her *** if that's what you're asking." Thereafter, Michael rested.

¶ 35    Following closing arguments by the parties, and limited solely to the issues presented on appeal, the court stated:

> "First of all[,] the decision as to whether it's in the interests of Mi'Kayla and the public that Mi'Kayla be made ward of the court, I think clearly it is. There's an issue here, an issue related to [Michael] *** [Danesha] believes [Michael] is or likely is Mi'Kayla's father, and that creates a connection in her mind between [Michael] and Mi'Kayla, and that's why *** [Michael's] at the hospital when these events happened *** because that

12

relationship exists in [Danesha's] mind. And there's a problem with that *** [because] [Michael] suffers from mental health issues *** [that] affect in a seriously negative way his ability to make decisions, *** in Mi'Kayla's best interests, [or] for Mi'Kayla's safety[;] it's a real problem, he can't do it. It's because of these mental health issues[,] and distorted thinking that they create, that he *** just cannot focus on *** on what Mi'Kayla needs, so there's a problem there.

Now it's *** in the best interests of Mi'Kayla and the public because of this problem within this family that she be made a ward of the court, and for guardianship in order for this to work, to establish and achieve the goals that Mi'Kayla needs for herself going forward here in her life, it's in the best interest of Mi'Kayla and the public that guardianship be removed from both parents and placed with DCFS.

The reason is because DCFS isn't going to be able to play the role that they need to play here in this situation unless they have guardianship. And the role they're going to have to play is, they're going to have to provide a structure that they can get involved with to manage the relationship between [Danesha] and [Michael], because [Danesha] can't do it. I don't know why, but she can't do it.

*** Mr. Barnett was very clear *** that [Danesha] understood that [Michael] has mental health issues, and because of those issues he [is] a problem. He's a problem for Mi'Kayla and Mi'Kayla's safety. She recognizes her role as Mi'Kayla's mother, and part of that have [*sic*] role being that she has to take action, whatever that might be, to protect Mi'Kayla from the danger that [Michael] presents. In Danesha's testimony today it is absolutely crystal clear that she does not appreciate what that problem is. She doesn't understand *** its importance [and] she doesn't accept its importance *** I'll say for the

13

record I had a chance to observe her demeanor while testifying, too. And even when she was answering *** whether she believed that [Michael] has mental health issues, and she said yes, her demeanor was completely unconvincing. Non-credible. *** What she would do is, she'd put her arms over her head, she'd lean back, she'd look down, she wouldn't look you in the eye while she was answering. Her tone of voice was completely different. All of those answers were not credible. And I don't know if it's because [Michael]'s in the room here and asking a lot of those questions, and he makes her really uncomfortable *** [o]r she wants to make it through the case as soon as possible and wants to say the right things so that she can be done and get DCFS out of her family's life as soon as possible. ***

I don't know exactly why. All I know is that [Danesha] doesn't fully appreciate the problem that [Michael] presents. ***

* * *

Something's there in her relationship with [Michael] that just interferes with her ability to establish that boundary. Is that something she can learn to appreciate and do? Absolutely. Is it something that she right now does? No. But with a court order that established that boundary, and with DCFS having guardianship to be able to establish that boundary for her, I don't have any reason to believe that she's allowing unauthorized contact with [Michael]. I don't have any reason to believe that she would. She is a fit, able, and willing parent, and custody shouldn't be removed from her."

¶ 36　After addressing Michael, the court restated its order regarding wardship, guardianship, and custody and suspended Michael's visitation pending a paternity determination. The court

ordered both parents to complete psychological evaluations and participate in genetic testing. Danesha timely appealed.

¶ 37                                          II. ANALYSIS

¶ 38                                            Neglect

¶ 39    "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H*., 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2020)) provides the two-step procedure utilized to determine whether a minor should be made ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 58. The first step, which occurs during the adjudicatory hearing, addresses only whether the child is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2020). The State must prove the allegations in the petition are "more probably true than not." *In re Z.L.*, 2021 IL 126931, ¶ 61. On review, we consider whether the circuit court's finding of neglect was against the manifest weight of the evidence. *Id*. A finding "is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 40    On appeal, Danesha contends that her child was injured as a result of an accident in which Mi'Kayla received immediate treatment when she and Michael took Mi'Kayla to Lurie Children's Hospital for treatment. She further states that no testimony was offered suggesting Mi'Kayla's injuries were aggravated by any delay in treatment. Danesha argues that she never left Mi'Kayla's side and Michael's only expressed concerns were for the child's rights and welfare. As such, Danesha claims the finding of neglect is against the manifest weight of the evidence.

¶ 41    First, Danesha's claim of error regarding the lack of testimony claiming that Mi'Kayla's injuries were aggravated by the delay in treatment has no merit. In addition to Danesha providing

15

no authority to support her claim, we note that a finding of neglect may be based solely on a risk of harm; actual harm is not required, although both may be factors for consideration "when assessing the degree of neglect." *In re D.F*., 201 Ill. 2d 476, 497 (2002). Danesha's contention is also contrary to DCFS regulations addressing reports of child abuse and neglect in which a "neglected child" is defined as one "who is subjected to an environment that is injurious insofar as: the child's environment creates *a likelihood of harm* as to the child's health, physical well-being, or welfare; and *the likely harm* to the child is the result of a blatant disregard of parent or caretaker responsibilities." (Emphases added.) 89 Ill. Adm. Code 300.20 (eff. Jan. 17, 2018). " 'Blatant disregard' means an incident where the real, significant, and imminent *risk of harm* would be so obvious to a reasonable parent or caretaker that it is unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures to protect the child from harm." (Emphasis added.) *Id*.

¶ 42    Here, the issues were whether Mi'Kayla was neglected by reason of being a minor in an environment injurious to her welfare because the environment exposed her to the effects of Michael's mental illness or erratic behavior. A plethora of evidence addressing Michael's behavior and mental condition, both at the hospital and in other settings, was presented by both the State and Michael. The evidence revealed that Michael's behavior was the result of a personality disorder that altered his perception of reality. Notably this evidence was presented by Michael via his examination of Dr. Jeckel. However, it is not enough for the State to present evidence of mental illness; "the State must also show that the mental illness 'places the child[ ] in an injurious environment.' " *In re Faith B*., 216 Ill. 2d 1, 14 (2005) (quoting *In re Faith B*., 349 Ill. App. 3d 930, 933 (2004)).

¶ 43    Here, the record revealed that Michael's constant obstructions interfered with the medical professionals' treatment of the minor. Notably, Michael "made delivery of care difficult for [the] entire team." He initially refused to allow the medical staff to even examine the minor. He also complained about the number of people trying to assess the minor and forced them to leave the minor's room. Thereafter a physician had to obtain Michael's permission before the medical team could reenter the minor's room to conduct the medical assessment. Michael also refused to consent to the medical professionals photographing the burns, the placement of an IV to provide fluids, and the transfer of the minor to a burn unit. Additionally, Dr. Jeckel specifically testified that Michael's mental illness diagnosis would interfere with his ability to make sound decisions regarding Mi'Kayla's health care.

¶ 44    Each case involving allegations of neglect is unique and must be decided on the basis of its "specific circumstances." *In re Arthur H*., 212 Ill. 2d at 463. " 'Neglect' is the failure to exercise the care that circumstances justly demand, and it encompasses both willful and unintentional disregard of parental duty." *In re Ivan H*., 382 Ill. App. 3d 1093, 1100 (2008) (citing *In re Gabriel E*., 372 Ill. App. 3d 817, 822 (2007)). "Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld." *In re Faith B*., 216 Ill. 2d at 14 (citing *In re D.D*., 196 Ill. 2d 405, 422 (2001).

¶ 45    Here, it is difficult to see how interference with emergency room medical professionals attempting to render treatment to a minor child would not place the minor child in an injurious environment. Regardless, even without evidence of Michael's actions, the finding of neglect as alleged in count I of the supplemental petition is supported by the unrebutted testimony from Dr. Jeckel.

¶ 46    As such, based on the evidence submitted, we cannot find that an opposite conclusion is clearly evident. Therefore, we affirm the circuit court's finding of neglect.

¶ 47                                    Wardship

¶ 48    After the circuit court determines a minor is neglected, the court moves to the second step, which is the dispositional hearing. 705 ILCS 405/2-21(2) (West 2020). At this hearing, the circuit "court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *In re Z.L.*, 2021 IL 126931, ¶ 60. If the court finds a wardship is proper, the court must determine the proper disposition best serving the health, safety, and best interests of the minor and the public. 705 ILCS 405/2-22(1) (West 2020). The circuit court's dispositional order is reversed only if the findings of fact are against the manifest weight of the evidence or the court's ultimate disposition represented an abuse of discretion. *In re April C.*, 326 Ill. App. 3d 245, 257 (2001).

¶ 49    On appeal, Danesha provides no argument regarding the circuit court's determination that Mi'Kayla should be made a ward of the court. As such, any such argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Her sole argument relates to that portion of the court's dispositional order granting guardianship to DCFS. She contends that in light of the court's finding her fit and able to care for Mi'Kayla, and leaving Mi'Kayla's custody with her, the dispositional order was an abuse of discretion. The argument claims the circuit court focused solely on her body language, her failure to make eye contact, and ignored Mr. Barnett's testimony. We disagree.

¶ 50    The circuit "court's opportunity to observe the demeanor and conduct of the parties must be given great weight." *In re A.W.*, 248 Ill. App. 3d 971, 977 (1993). We defer to a circuit court's "credibility assessments because it is in the best position to make such findings." *In re April C.*, 345 Ill. App. 3d 872, 889 (2004). Here, the circuit court specifically noted that it had the

18

opportunity to observe Danesha's demeanor while testifying and explained which of her actions led it to conclude she was not credible. "We will not *** reassess witness credibility on appeal." (Internal quotation marks omitted.) *Id.*

¶ 51 However, even if no commentary on demeanor was provided by the circuit court or considered on appeal, more than sufficient evidence supported the circuit court's disposition ordering guardianship. While Mr. Barnett provided glowing testimony regarding Danesha's ability to parent her child as well as her progress with her services, his testimony was based *inter alia* on specific statements Danesha provided to him during the integrative assessment regarding her thoughts on Michael and whether he presented a danger to Mi'Kayla. It was Danesha's own testimony at the hearing that undermined Mr. Barnett's testimony on these latter issues.

¶ 52 At best, Danesha's testimony was equivocal as it oscillated from a belief that Michael was dangerous to a belief that allowing Michael around Mi'Kayla posed no danger to either Mi'Kayla or herself. Danesha's statements further vacillated between affirmatively stating that Mi'Kayla would be better off without Michael in her life to not knowing whether Mi'Kayla would be better off without Michael. When asked by her counsel if she felt it was safe to leave Mi'Kayla alone with Michael, Danesha replied, "No." However, when questioned by the State, Danesha stated she did not know if she felt it was safe to leave Mi'Kayla alone with Michael. While Mr. Barnett testified that Danesha disclosed to him that she had concerns about Michael's mental health and the impact his issues would have on his ability to parent, Danesha disputed ever stating that Michael had a mental illness. Danesha later stated that she believed Michael had some mental health issues, but she did not know if that made him a dangerous caregiver to Mi'Kayla. Such conflicting testimony is uncompelling regardless of demeanor or any newly claimed confusion as to the questions asked.

19

¶ 53 Contrary to Danesha's claims, the circuit court's disposition was not based solely on Danesha's demeanor. Nor did it ignore Mr. Barnett's testimony. We find nothing in this record that substantiates Danesha's claim that the circuit court "disregarded" any evidence or determined the proper disposition after making Mi'Kayla a ward of the court solely "on the basis of body language." Danesha's claim that the circuit court's placement of guardianship with DCFS was "arbitrary or unsubstantiated by the evidence" is uncompelling. As such, we find the circuit court's dispositional order was neither against the manifest weight of the evidence nor an abuse of discretion.

¶ 54                                    III. CONCLUSION

¶ 55 For the reasons stated herein, we affirm the circuit court's adjudicatory and dispositional orders.

¶ 56 Affirmed.